<u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS</u>

I, Special Agent Adalberto Garcia, being duly sworn, depose and state that:

INTRODUCTION

1.       I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for over a year.  I graduated from the DEA Special Agent Academy in 2019. Prior to that, I was employed as a Police Officer with the Nashua, New Hampshire Police Department for over eleven years.  For approximately four years, I was assigned to the Detective Bureau.  For three of those years, I was assigned to the Nashua Police Department Drug Unit. While working in the drug unit, I was primarily assigned to the DEA High Intensity Drug Trafficking Area Task Force in the Manchester, New Hampshire District Office ("MDO"), where I was deputized as a DEA Task Force Officer.  Since becoming a Special Agent with DEA, I have been assigned to the DEA Cross Border Initiative Task Force ("CBI") located in Massachusetts. In addition to the DEA academy, I have attended narcotic and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, and the Nashua Police Department. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

2.       I have received significant training in the field of narcotics enforcement and investigations. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.  Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including

1

purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

3.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.     Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, and use multiple cellular telephones simultaneously, in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

5.     Based on my training and experience, I am also aware that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors

and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles.  Consequently, the location of vehicles used by narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

6.      More broadly, based upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

7.      Based on my training and experience, tracking narcotics traffickers in motor vehicles often corroborates and verifies other information and investigative leads derived from other investigative techniques including informants, wiretaps, and visual surveillance.

## PURPOSE OF AFFIDAVIT

8.      I submit this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A), for information about the location of the following telephone:

a. An AT&T Wireless cellular phone assigned phone number 603-521-0893, accessed through International Mobile Subscriber Identity ("IMSI") 310280012786407, subscribed to Daniel Michael LENNON ("LENNON") (hereinafter, the "Target Telephone").

9.      AT&T Wireless, the service provider for the Target Telephone, is a wireless telephone service provider that accepts service of process at 11760 US Highway 1, Suite 600, North Palm Beach, Florida.  The Target Telephone is further described in Attachment A1, and the location information to be seized is further described in Attachment B1.

10.      I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, described in Attachment B2, to determine the location of the Target Telephone, described in Attachment A2.

11.      Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.  *See* 18 U.S.C. §§ 3121-3127.  This warrant therefore includes all the information required to be included in a pen register order.  *See* 18 U.S.C. § 3123(b)(1).

12.      Finally, I make this affidavit in support of an application for an Order, pursuant to Rule 41(e)(2)(C) and Title 18, United States Code, Section 3117, authorizing agents of the DEA to surreptitiously install, monitor, repair, replace and use a real-time Global Positioning System ("GPS") mobile tracking device for 45 days on the following motor vehicle located in the District

of Massachusetts for the purpose of monitoring and recording data regarding the movement of this motor vehicle both inside and outside the District of Massachusetts:

      a.   A Red Jeep Renegade bearing New Hampshire registration 482 2036, registered to LENNON (the "Target Vehicle").

13.    As part of my duties, I am currently participating in an investigation into the criminal activity of LENNON, the subscriber and suspected user of the Target Telephone, and owner/operator of the Target Vehicle.  I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, court-authorized wire interceptions, and my personal review of records and reports relating to the investigation.

14.    As set forth below, based on the investigation to date, I believe that LENNON is using both the Target Telephone and Target Vehicle, including to facilitate his drug trafficking activities.  Accordingly, there is probable cause to believe that the location information described in Attachment B1, obtained through using the technique described in Attachment B2, and obtained through the use of the GPS tracking device, will assist agents with locating LENNON, identifying locations he uses to receive and distribute narcotics and narcotics proceeds, conducting physical surveillance of him and his criminal associates, and perhaps seizing contraband such as drugs or drug proceeds.

15.    Based on my training and experience, and for all the reasons set forth herein, probable cause exists to believe that the requested location information will constitute or lead to evidence of offenses involving the distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), the use of a communication facility in the commission of

narcotics trafficking offenses, in violation of Title 21, United States Code, Section 843(b), and conspiracy to commit narcotics trafficking offenses, in violation of Title 21, United States Code, Section 846 (the "Target Offenses"), as well as the identification of individuals who are engaged in the commission of the Target Offenses.

16.     Since this Affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the foundation for these warrants.

PROBABLE CAUSE

17.     Beginning in approximately January 2021, a source of information ("SOI") provided information to investigators about LENNON's methamphetamine trafficking activities. SOI told investigators that LENNON lived with his girlfriend at 230 Boston Street in Dorchester, Massachusetts.  SOI stated that LENNON sells 10-12 pounds of methamphetamine per week, and also sells other drugs, including heroin/fentanyl, pills, and cocaine/crack cocaine.  SOI admitted that s/he had previously purchased methamphetamine and cocaine from LENNON on multiple occasions. SOI provided this information to investigators in hopes of receiving leniency in charging and/or sentencing decisions with respect to his/her criminal behavior in New Hampshire. The information provided by SOI has been corroborated to the extent possible, and SOI successfully introduced an undercover agent ("UC") to LENNON via telephone, and provided UC with LENNON's contact information.  As discussed in detail below, UC was then able to make two controlled purchases of suspected methamphetamine directly from LENNON.   As such, SOI is believed to be reliable.

January 13, 2021 Undercover Purchase of One Ounce of Methamphetamine from LENNON

18.     On January 11, 2021, at approximately 5:08 p.m., UC contacted LENNON via text message at telephone number 857-707-9941 ("the 9941 number"). The 9941 number is a T-Mobile cellular device subscribed to Daniel LENNON and Suman Nath. In a series of text messages, UC ordered an ounce of methamphetamine from LENNON for $550. UC and LENNON agreed to conduct the transaction on January 13, 2021, in Boston.

19.     On January 12, 2021, at approximately 2:58 p.m., UC sent a text message to the 9941 number to confirm that LENNON could still conduct the methamphetamine transaction the following day. UC did not hear from LENNON until approximately 10:01 p.m., at which point LENNON responded and provided UC with his new number—the Target Telephone—and instructed UC to use the Target Telephone to reach him. At approximately 10:22 p.m., UC sent a text message to the Target Telephone and asked LENNON if they could meet around 1 p.m. the following day. LENNON confirmed that he could meet at that time.

20.     On January 13, 2021, at approximately 11:29 p.m., UC called LENNON on the Target Telephone and asked LENNON where they should meet. LENNON told UC that he was staying at the Westin Copley Place Hotel, located at 10 Huntington Avenue in Boston, and that UC could meet him at the valet parking area of the hotel so they could take a quick drive together in UC's vehicle. At approximately 12:11 p.m., UC sent a text message to the Target Telephone, informing LENNON that he was approximately 45 minutes away and would call when UC was close. LENNON responded, "Perfect."

21.     At approximately 12:53 p.m., UC sent a text message to the Target Telephone, stating that UC was approximately one minute away. LENNON responded, stating that he had

run to the bank and would be back shortly.  UC arrived and parked at the valet area of the Westin

Copley Place Hotel and waited.  At approximately 1:19 p.m., LENNON, via the Target Telephone,

sent a text message to UC and asked if UC was in the particular make and model of the UC vehicle.[1]

UC confirmed.  Moments later, LENNON entered the front passenger seat of the UC vehicle.

LENNON directed UC to drive out of the hotel parking area.  While UC and LENNON engaged

in brief small talk and UC drove a short distance, LENNON removed a clear plastic bag from his

left front pocket and placed it into the front cup holder of the UC vehicle.  The plastic bag contained

a rock crystal-like substance.  UC handed LENNON $550 in official funds.  LENNON then

instructed UC to pull over at the end of the parking lot, where LENNON exited the UC vehicle.

22.     UC drove to meet up with other investigators and relinquished the plastic bag

containing the crystal substance.  The substance was sent to the DEA laboratory for testing and

results are pending.  Based on the color and texture of the substance, investigators believe the

substance contains methamphetamine.

<u>January 19, 2021 Undercover Purchase of Quarter-Pound of Methamphetamine from LENNON</u>

23.     On January 19, 2021, at approximately 9:49 a.m., UC sent a text message to

LENNON at the Target Telephone, looking to purchase a quarter-pound of methamphetamine.

LENNON agreed to sell UC the quarter-pound of methamphetamine for $2,100.  UC asked if

LENNON could meet that day.  LENNON responded from the Target Telephone, at approximately

12:31 p.m., stating that he could meet that day, and that he was located in Medford, Massachusetts.

LENNON proposed meeting at a parking garage near 95 Station Landing at approximately 1:30

---

[1] To protect the UC's identity, I am omitting the specific make and model LENNON referenced.

p.m.  LENNON also sent a text message from the Target Telephone stating, "I can have my girl run out and meet you if need be."

24.     At approximately 1:51 p.m., LENNON sent UC a text message from the Target Telephone, asking UC how far away UC was, and UC responded that UC was approximately five minutes away.  At approximately 2:00 p.m., UC called LENNON at the Target Telephone and stated that UC was parked outside 95 Station Landing, which is a Marriot Hotel.  LENNON stated that he would be right down and, moments later, LENNON walked out of the hotel and entered the front passenger seat of the UC vehicle.  While LENNON and UC were engaging in small talk, LENNON took a clear plastic bag out of his front sweatshirt pocket and placed it into the UC vehicle's cup holder.  Inside the plastic bag were numerous crystal rocks.  UC handed LENNON $2,100 in official funds.  LENNON exited the UC vehicle and walked into the hotel.

25.     UC drove to meet up with other investigators and relinquished the plastic bag containing the rock-crystal substance.  The substance was sent to the DEA laboratory for testing, and results are pending.  Based on the color and texture of the substance, investigators believe the substance contains methamphetamine.

26.     Based on all of the above, I believe LENNON uses the Target Telephone in furtherance of his drug trafficking activities and that the requested location information will enable investigators to locate LENNON, identify locations he uses to receive and distribute narcotics and narcotics proceeds, conduct physical surveillance of him and his criminal associates, and perhaps seizing contraband such as drugs or drug proceeds.

<u>Target Vehicle</u>

27.     On January 7, 2021, at approximately 11:39 a.m., investigators observed the Target Vehicle parked near 230 Boston Street in Dorchester, Massachusetts.  At approximately 1:48 p.m., investigators observed LENNON exit from 230 Boston Street and enter the driver's seat of the Target Vehicle.  LENNON drove the Target Vehicle away from the area and returned to park the Target Vehicle outside 230 Boston Street by approximately 2:15 p.m.  After remaining in the Target Vehicle for a few minutes, LENNON exited the Target Vehicle and walked into the front door of 230 Boston Street.

28.     During the January 19, 2021, meeting, LENNON told UC that his car had been towed from outside the hotel where they were then meeting.  Agents later confirmed that the Target Vehicle had been towed from the Marriot hotel to Stephens Automotive Transport in Medford, Massachusetts.  A representative from Stephens informed investigators that a male using the Target Telephone number had called to inquire about picking up the Target Vehicle.  Later that day, a woman believed to be LENNON's girlfriend retrieved the Target Vehicle from Stephens Automotive Transport.

29.     On January 21, 2021, at approximately 1:56 p.m., investigators observed the Target Vehicle parked outside the Marriot hotel located at 95 Station Landing in Medford.  Investigators maintained surveillance of the Target Vehicle as it drove away from the hotel and were able to observe LENNON as the operator of the Target Vehicle and a female in the front passenger seat. Investigators followed LENNON in the Target Vehicle into Boston, where LENNON was observed to conduct multiple U-turns in what appeared to be an attempt to detect surveillance. Investigators maintained surveillance and eventually observed LENNON drive the Target Vehicle

to the Marriot Courtyard Downtown/North Station, where he parked.  Investigators observed LENNON unload luggage from the rear of the Target Vehicle and enter the Marriot Courtyard with the woman.

30.     Based on the above, I believe LENNON is the owner/operator of the Target Vehicle.  As such, there is probable cause to believe that information about the Target Vehicle's location and movement will lead to: (a) the identification of potential criminal associates; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered.

### APPLICABLE CELLULAR TECHNOLOGY-PRECISE LOCATION INFORMATION

31.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not

necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

32.     The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510).  To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

AUTHORIZATION REQUEST-PRECISE LOCATION INFORMATION

33.     Based on the foregoing, I believe there is probable cause to believe that LENNON is committing and will continue to commit the Target Offenses.  I further believe that there is probable cause to believe that the location information described in Attachment B1 will constitute and lead to further evidence of LENNON's drug trafficking activities.  Specifically, because the Target Telephone is a cellular telephone, which is likely to be carried on the person of the user, the location information described in Attachment B1 will assist agents with locating LENNON, locating and identifying his criminal associates in Massachusetts, conducting physical surveillance of him and his associates, and identifying locations used to receive, store, and distribute drugs.

34.     I request that the Court issue the proposed search warrant for precise location information for the Target Telephone, pursuant to Title 18 United States Code, Section 2703(c) and Federal Rule of Criminal Procedure 41.

35.     I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B1 unobtrusively and with a minimum of interference with AT&T's services, including by initiating signals to determine the locations of the Target Telephone on

AT&T's network, and at such intervals and times as directed by the government. The government will compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

36.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order AT&T not to notify any person (including the subscriber or customer to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). AT&T may disclose the warrant to an attorney for AT&T for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is reason to believe that notification of the existence of the warrant will seriously jeopardize the investigation, including by: giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or intimidate potential witnesses. *See* 18 U.S.C. § 2705(b).

37.     I further request that the Court authorize execution of the precise location information warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

38.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an

13

adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).   There is reasonable necessity for the use of the techniques described above, for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

## RELEVANT TECHNOLOGY-CELL-SITE SIMULATOR

39.    Based on my training and experience, I know that precise location information obtained from providers (described above) can vary in its specificity.  This information can identify the Target Telephone within a general area ranging from a few meters, up to thousands of meters.  In order to achieve the goals of this investigation, I know that also utilizing the electronic investigative technique, which is described in Attachment B2, will help investigators determine the location of the cellular device with greater specificity within the general area identified by the provider.

40.    In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication.  These signals include a cellular device's unique identifiers.

41.    To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Telephone or receiving signals from nearby cellular devices, including the Target Telephone.  Such a device

may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others.  The device may send a signal to the Target Telephone and thereby prompt it to send signals that include the unique identifier of the device.  Law enforcement may monitor the signals broadcast by the Target Telephone and use that information to determine the Target Telephone's location, even if it is located inside a house, apartment, or other building.

42.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity.  Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.  In order to connect with the Target Telephone, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.  These signals may include cell phone identifiers.  The device will not complete a connection with cellular devices determined not to be the Target Telephone, and law enforcement will limit collection of information from devices other than the Target Telephone.  To the extent that any information from a cellular device other than the Target Telephone is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Telephone from all other cellular devices.

AUTHORIZATION REQUEST-CELL-SITE SIMULATOR

43.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.  The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

44.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and continue to flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

45.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

46.     A search warrant may not be legally necessary to compel the investigative technique described in this affidavit.  Nevertheless, I submit this warrant application out of an abundance of caution.

AUTHORIZATION REQUEST-TRACKING DEVICE

47.     Based on the foregoing, I request that the Court issue a warrant authorizing members of DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the Target Vehicle within the District of Massachusetts within 10 calendar days of the warrant's issuance and to repair, replace, maintain and remove said tracking device from the subject vehicle after the use of the tracking device has ended, to move the subject vehicle

to effect the tracking device's installation, repair, replacement, and removal; and to monitor the tracking device for a period of 45 days following the warrant's issuance.

48.     To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, the United States further requests the Court authorize installation, replacement, maintenance and removal of the tracking device during both daytime and nighttime hours.

49.     Because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation, the United States also requests that the warrant delay notification of the execution of the warrant for a period not to exceed 30 days after the end of the authorized period of tracking (including any extensions thereof), in accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3).

/

/

/

/

/

/

/

/

/

/

/

/

50.     I further request that the Court order that all papers in support of these applications, including the affidavit and the search warrants, be sealed until further order of the Court, except that the government may provide the precise location information search warrant to AT&T, and may serve the warrants and related papers on Special Agents and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrants.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

_Adalberto Garcia_
Adalberto Garcia
DEA Special Agent

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1, this 26th day of January, 2021.

_____
HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

18

**ATTACHMENT A1**

Information about the location of the mobile phone assigned telephone number 603-521-0893, accessed through International Mobile Subscriber Identity ("IMSI") 310280012786407, subscribed to Daniel Michael LENNON (hereinafter, the "Target Telephone"), whose service provider is AT&T, a company that accepts process at 11760 US Highway 1, Suite 600, North Palm Beach, Florida.

**ATTACHMENT B1**

Evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"), to wit:

All information about the location of the Target Telephone described in Attachment A1 for a period of thirty days from the date of the execution of this warrant, during all times of day and night, including:

1.   E-911 Phase II data;

2.   GPS data;

3.   latitude-longitude data;

4.   other precise location information;

5.   data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Telephone.

This warrant does not authorize the collection of any content of any communications.

AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Telephone unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Telephone on AT&T's network, and at such intervals and times directed by the government.  The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of Information about the location of

the Target Telephone.  *See* 18 U.S.C. § 3103a(b)(2).

AT&T shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b).  *See* 18 U.S.C. § 2705(b).  AT&T may disclose this Order to an attorney for AT&T for the purpose of receiving legal advice.

## ATTACHMENT A2

This warrant authorizes the use of the electronic investigative technique described in Attachment B2 to identify the location of the cellular device assigned phone number 603-521-0893, accessed through International Mobile Subscriber Identity ("IMSI") 310280012786407, subscribed to Daniel Michael LENNON (hereinafter, the "Target Telephone"), whose service provider is AT&T, a company that accepts process at 11760 US Highway 1, Suite 600, North Palm Beach, Florida.

## ATTACHMENT B2

In connection with the investigation of Daniel Michael LENNON for violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"),  this warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A2 by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers

for a period of 30 days, during all times of day and night.  This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property.  The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).